THE STATE OF OHIO, APPELLEE, *v.* CLAYTOR, APPELLANT.

[Cite as *State v. Claytor* (1991), 61 Ohio St.3d 234.]

(No. 89–499—Submitted April 23, 1991—Decided July 31, 1991.)

*Stephanie Tubbs Jones*, prosecuting attorney, and *Michael S. Nolan*, for appellee.

*Carla M. Tricarichi* and *Ralph V. Cosiano*, for appellant.

WRIGHT, J. We are required by R.C. 2929.05(A) to review the ten propositions of law alleging errors appellant claims were committed in the courts below. We are also charged with making an independent review of the record to determine whether the aggravating circumstances the appellant was found guilty of committing outweighed the mitigating factors asserted beyond a reasonable doubt.

## I

### A

Appellant's first proposition of law attacks the validity of the death sentence because the trial judge replaced an ailing juror with one of the alternates after the guilt phase. Appellant contends that the substitution violated the rule laid down in *State v. Penix* (1987), 32 Ohio St.3d 369, 373, 513 N.E.2d 744, 748, that " * * * decisions leading to a death sentence must be made by the same jury that convicted the offender in the guilt phase. * * * " We dealt with this issue in *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, paragraph two of the syllabus, holding that the " * * * 'trial jury' * * * consists of all the jurors, including any properly substituted alternates." Thus, this proposition is not well-taken.

### B

Next, appellant challenges his conviction for escape in violation of R.C. 2921.34 on the grounds that he was never in the custody of the two security guards he killed. R.C. 2921.34(A) states in part: "No person, knowing he is under detention or being reckless in that regard, shall purposely break or attempt to break such detention * * *." We held in *State v. Reed* (1981), 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359, syllabus, that a person is considered under "detention" within the meaning of the statute when that person has been " * * * arrested and the arresting officer has established control over his person." In *Reed*, a police officer had stopped a car

containing persons the officer believed had been planning to rob a store. As the officer approached the car, he ordered the occupants to get out. The driver, Wayne Reed, stepped out of the car and shot the officer, killing him and wounding another man. This court held that the officer had not established the control required for the defendant to be guilty of committing a homicide in order to escape custody.

The court of appeals found appellant's reliance on *Reed* misplaced because it felt that a rational trier of fact could have found the security guards had established control when they stopped Claytor and Powell and asked for identification. But the court of appeals cites no evidence that either security guard had the intent to arrest, one of the required elements of the existence of an arrest. The other elements are real or pretended authority to arrest, accompanied by an actual or constructive seizure or detention of the person, which is so understood by the person arrested. *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324, paragraph one of the syllabus. Contrary to the assertion in appellee's brief that the guards' supervisor, Sergeant Joseph Gagliardo, had dispatched Decker to find Claytor and Powell, the record shows that Gagliardo simply told Decker to go on mobile patrol. In fact, the testimony of Sgt. Gagliardo shows that at the time he felt no apparent concern regarding these two men, even though Powell had tried to get the sergeant's attention with a message printed on his hand to the effect that he needed help with Claytor. Even after Decker told Gagliardo that he (Decker) had been told of a warrant for Claytor's arrest, Gagliardo took no overt action. After Decker radioed the office, while in the cruiser with Wilcox, that he had spotted the two men, Gagliardo waited a minute then radioed back, seeking the disposition of the stop. He did not order the guards to detain the two men nor did he indicate in his testimony that Decker said anything about taking the two men into custody. Nor is there evidence to support the court of appeals' assertion that Decker and Wilcox were specifically sent to find Claytor and Powell to verify the report about the arrest warrants. Powell testified that the officers "asked for some kind of an identification * * *." There was further testimony that Wilcox and Claytor had a brief conversation, with Wilcox asking whether Claytor was familiar with the program at the hospital. There is no evidence that could even be inferred from Gagliardo's testimony that he wanted Decker and Wilcox to place the two men in custody or detain them in any way, even though he knew that Decker and Wilcox had found the men and stopped to talk to them. Claytor may well have feared that he was about to be arrested. But there is simply nothing in the record to support a finding that the guards intended to arrest the two men when they asked for identification or that the two men understood the request to be tantamount to being placed in custody.

Therefore, using the standard of *Reed,* we hold that appellant was not in custody at the time of the shooting and could not be guilty of escape. Appellant's second proposition of error is sustained. Consequently, appellant's convictions for aggravated murder with specifications on Counts Four and Six of the indictment are reversed since they were predicated upon appellant committing, or attempting to commit, escape. We further hold, pursuant to Crim.R. 33(A)(4), that there was sufficient evidence to convict appellant of murder in violation of R.C. 2903.02. See *State v. Reed, supra.*

## C

Appellant's third proposition asserts that the trial court erred in not instructing the jury on the lesser included offense of murder. However, defense counsel did not request this instruction and appellant now alleges that this failure constituted plain error. (Appellant further asserts that this failure is evidence of ineffective assistance of counsel.) Appellant's counsel conceded in a sidebar conference during appellant's direct examination that the "chief defense of the case" was insanity. Appellant now contends that the evidence "might conceivably have justified the jury" in finding appellant guilty of the lesser included offense of murder. But counsel did not try the case on such a theory or request that the jury be given such instructions. Crim.R. 30(A) provides:

" * * * *

"A party may not assign as error the * * * failure to give any instructions unless he objects thereto before the jury retires * * *."

What appears to have been a tactical decision in this case during the trial cannot now be converted into judicial error. The appellant's third proposition is not well-taken.

## D

Appellant's fourth proposition of law concerns the trial judge's refusal to grant a two-week continuance before the start of the penalty phase of the trial. The jury verdict came in on a Tuesday afternoon. The judge scheduled the penalty phase to begin the following Monday. At a hearing on Friday, defense counsel said there were relatives of appellant, whose names he did not know, that he might want to contact. He also said there were social workers at the Veterans Administration Medical Center who might be able to testify. Under questioning by the trial judge, appellant's counsel conceded that from the time the verdict was returned until the hearing on Friday both defense counsel were working on other matters. The issue here is whether they had

the opportunity to make reasonable investigations, or made a reasonable decision that certain investigations were unnecessary. See *Strickland v. Washington* (1984), 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695. The decision to grant a continuance is within the discretion of the trial judge. *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus. Considering the sketchy reasons offered at the time by appellant's counsel, the trial judge's decision to deny the continuance was well within his discretion. Absent a finding of abuse of discretion, coupled with no showing of what evidence could have been produced that was omitted, this court will not reverse a conviction for failure to grant a continuance. The fourth proposition is not well-taken.

E

The fifth proposition of law alleges that there was no evidence of prior calculation and design in the murders or that the murders were committed while Claytor was trying to escape. We have already decided that there was no escape involved. However, there was evidence of prior calculation and design in the shooting of security guard Wilcox as alleged in Count Five of the indictment. After Claytor shot security guard Decker, he wounded Wilcox, then pursued the wounded man as he attempted to flee, finally killing him with a bullet in the face. Appellant stalked his victim in a manner similar to that described in *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, where this court held a defendant had shown prior calculation and design when he first wounded a police officer and then, after shooting a second officer, ran to the first officer and killed him with another shot. Appellant asserts that prior calculation and design requires more than "[i]nstantaneous deliberation," citing *Cotton*. We agree, but find that appellant's acts could be viewed as going beyond the impulse of the moment to constitute prior calculation and design. The fifth proposition is not well-taken.

F

Appellant's sixth proposition of law contends that the trial court erroneously instructed the jury during the penalty phase to exclude all consideration of mercy, compassion or sympathy. He told the jury: "Now, do not be influenced by any considerations during your deliberations of sympathy or prejudice." This type of instruction was approved in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus. Accordingly, this proposition is not well-taken.

G

The seventh proposition of law contends that the trial judge, in his separate opinion, impermissibly considered aggravating circumstances that were not before the jury. The judge found two aggravating circumstances: one, that the offense had been committed for the purpose of escaping detection, apprehension, trial or punishment for another offense committed by the offender and two, that the offense was part of a course of conduct involving the purposeful killing of two people. In discussing the former, the trial court referred to the fact that Claytor knew there was an outstanding warrant for his arrest for a previous robbery and shooting. There was testimony presented at trial that Claytor knew that police were looking for him and that he was concerned about it. The trial court did not go beyond the record in reasoning that Claytor was fearful about being taken into custody for that crime when he opened fire on the security guards. Admittedly, the aggravating circumstances in the indictment regarding a purpose of escaping apprehension for another offense referred to the crime of killing guard Mark Decker, not the robbery and shooting that resulted in the warrant mentioned at trial. However, the judge went on in his opinion to characterize the killing of Wilcox as Claytor's elimination of an eyewitness. Further, this court held in *State v. Cooey* (1989), 46 Ohio St.3d 20, 35–36, 544 N.E.2d 895, 914, that where the sentencing opinion listed the aggravating circumstances precisely, it was harmless error for a prosecutor to discuss the surrounding facts of the offense in closing argument in the penalty phase. Here, we have the trial judge expounding on matters raised at trial to explain his precise findings concerning the aggravating circumstances. Thus, the reference to the events surrounding the warrant, while error, was harmless in character since it could not have affected the jury's deliberations and appears to have been an additional reason, not the sole one, for the trial judge's finding that the aggravating circumstances outweighed the mitigating factors. Therefore, this proposition is not well-taken.

H

Appellant's eighth proposition of law states that the mitigating factor related to mental disease or defect is unconstitutional because it unduly limits the jury's consideration of the appellant's mental illness. Appellant's argument focuses on the similarity between the test for insanity in Ohio and the language of the mitigation statute. The test for insanity, from *State v. Staten* (1969), 18 Ohio St.2d 13, 47 O.O.2d 82, 247 N.E.2d 293, is whether a defendant, " * * * as a result of mental disease or defect, * * * does not have the capacity either to know the wrongfulness of his conduct or to conform his

conduct to the requirements of law." *Id.* at paragraph one of the syllabus. R.C. 2929.04(B)(3), the mitigation statute in question, requires the jury or panel to consider "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked *substantial* capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Emphasis added.) Appellant's argument appears to be that the difference was too subtle for jurors to appreciate, evidenced by the fact that they did not find Claytor's admitted mental illness to be a mitigating factor of sufficient weight to overcome the aggravating factors in Counts Five and Six. However, during the penalty phase, the psychiatrist who testified for the defense went to considerable lengths to explain the difference. In fact, he noted that while he had not found Claytor "insane" using the *Staten* test, he was emphatic that Claytor had lacked "substantial" capacity to refrain from his criminal acts of killing the two guards. The fact that the jury and the judge chose not to give that evidence as much weight as other evidence is not proof that the statute is unduly limiting and thus unconstitutional. This proposition is not well-taken.

## I

Appellant's ninth proposition of law logically follows the issue implied in the eighth proposition, *i.e.*, that the jury and trial judge ignored the greater weight of the evidence in finding that the aggravating circumstances outweighed the mitigating factors, as did the court of appeals through its affirmance of the sentence. In support of this proposition, appellant offers the fact that, in the penalty phase, there was unrebutted testimony that Claytor's mental disease resulted in his lack of substantial capacity to refrain from criminal misconduct. However, appellant cites no authority that requires the jury, or the judge, to accord this opinion testimony more weight than contrary expert opinion, offered during the guilt phase, that Claytor was able to refrain from misconduct, or to accord it more weight than the aggravating circumstances. Nor does appellant offer any evidence that the jury, judge or court of appeals acted in an "unreasonable, arbitrary or unconscionable" manner, which is the standard for deciding whether there has been an abuse of discretion. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. Accordingly, this proposition is not well-taken.

## J

In his tenth proposition, appellant raises a novel challenge to Ohio's statutory framework for sentencing in a capital case. Appellant contends that the process is fatally flawed because a jury is afforded only three choices from

which to choose in recommending a sentence: (1) death; (2) life imprisonment with parole eligibility after twenty years in prison; or (3) life imprisonment with parole eligibility after thirty years in prison. By including the possibility of parole, appellant contends, the state tilts the process in favor of the death penalty. Implicit in this position is the suggestion that a jury, inclined against recommending the death penalty, would nonetheless favor the death penalty over the possibility that the defendant might someday be paroled. Appellant finds this position strengthened by the "death qualification" of the jury. What appellant does not do is cite any legal authority—or any scientific or survey research—to support his claim. This court rejected a similar allegation in *State v. Williams* (1986), 23 Ohio St.3d 16, 23 OBR 13, 490 N.E.2d 906, where appellant claimed the " * * * sentencing framework does not pass constitutional muster by failing to afford juries the opportunity to impose life sentences. * * * " *Id.* at 24, 23 OBR at 20, 490 N.E.2d at 914. In the instant case, appellant appears to argue that the options should include a life sentence without possibility of parole. Whatever merit that option may have, it does not follow that its absence leaves those options that are available weighted in favor of the death penalty. " * * * The death penalty only becomes a mandatory sentence if the sentencing authority decides that the aggravating circumstances outweigh the evidence given in mitigation. * * * " *Id.* at 24, 23 OBR at 20, 490 N.E.2d at 914. The balance of the claims in appellant's tenth proposition have been rejected by this court in *State v. Jenkins, supra.* Accordingly, this proposition is not well-taken.

Having sustained appellant's second proposition of law and reversed his conviction on the counts related to escape, we affirm appellant's conviction on Count Five.

## II

We are further required, by R.C. 2929.05, to conduct an independent review of the record to determine whether the death penalty was inappropriate or disproportionate to the penalty imposed in similar cases and to determine whether the aggravating factors outweigh the mitigating factors by proof beyond a reasonable doubt.

Ohio's statute setting forth criteria for imposing the death penalty or imprisonment for a capital offense lists seven mitigating factors. R.C. 2929.04(B)(1) through (7). Appellant offered evidence that, because of a mental disease, he lacked substantial capacity to conform his conduct to the requirements of the law. R.C. 2929.04(B)(3). Also, appellant had no history of prior criminal convictions or delinquency adjudications. R.C. 2929.04(B)(5).

During the penalty phase, a psychiatrist and psychologist testified that Claytor was mentally ill and that as a result of that illness he lacked the substantial capacity to conform his conduct to the requirements of the law. Likewise, the state's expert witnesses who testified during the guilt phase agreed that Claytor was suffering from chronic paranoid schizophrenia, which occasionally became acute. In layman's terms, what the experts meant was that Claytor's mental illness was always with him and that it sometimes erupted in violent episodes. These episodes usually resulted in his mother having him committed to a mental institution. In the four years before that fateful evening of January 31, 1986, Claytor had been committed to the Cleveland Psychiatric Institute four times and the Veterans Administration Medical Center eight times for treatment of his schizophrenia. Interspersed with these commitments were nine other, briefer emergency room visits to Cleveland hospital emergency rooms. His last hospital contact had been just three months prior to the two homicides.

In the separate opinion required by R.C. 2929.03(F), the trial judge found that the mitigating factor of a mental defect resulting in a lack of substantial capacity to refrain was established. He further found the mitigating factor of no prior criminal history. The judge went on to note: "Every expert testified in this case that the defendant knew that his conduct was wrong. The dispute is whether the defendant was able to refrain from committing these acts." On that point, the Court of Appeals for Cuyahoga County held: " * * * The primary issue contested in the mitigation proceeding was whether the defendant lacked the substantial capacity to conform his conduct to the requirements of the law. Stated otherwise, the defense maintained that the defendant was unable to refrain from acting. * * * "

The trial court and court of appeals appear to have blended the rule for legal insanity—total inability to refrain from acting—with the mitigation standard, which is the lesser "lacked substantial capacity" to refrain. The result raises a serious question as to whether this language reflects a flawed analysis that affected the weighing process. Both courts found the mitigating factor to be present, but both appear to have believed that the factor required total inability to refrain and may have been reluctant to accord it the appropriate weight for that reason.

We are bound by statute to conduct an independent review to determine whether the evidence supports the findings below and " * * * whether the sentencing court properly weighed the aggravating circumstances * * * and the mitigating factors." R.C. 2929.05(A). The mitigating factor involving Claytor's undisputed mental illness and the impact it had on his reasoning process should have been accorded more weight. In arriving at that conclu-

sion, we direct attention to the following points, overwhelmingly established by expert testimony on both sides:

(1) Appellant had stopped taking his medication and that practice, in the past, had led inexorably to a deterioration of appellant's stability, characterized by episodes of violent conduct leading, in turn, to hospitalization.

(2) Appellant had a morbid fear of rectal examinations, which he was convinced he would have to undergo if committed again to the hospital. (Given this fact, guard Leonard Wilcox's question as to whether appellant knew about the program at the hospital [see Part IB above] moments before the shooting takes on added significance.)

These two factors, taken together, lead us to the factual conclusion that the murders of Decker and Wilcox were the product of appellant's mental disease such that we cannot find that the aggravating circumstances of the crime have been shown to outweigh the mitigating factors by proof beyond a reasonable doubt. Consequently, we reverse appellant's sentence of death and remand this case to the trial court for resentencing on Counts Four and Six in accord with the findings herein and for imposition of a life sentence on Count Five in accordance with the dictates of R.C. 2929.06 and *State v. Penix, supra.*[1] This finding obviates the need for a proportionality review.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

MOYER, C.J., SWEENEY, HOLMES and H. BROWN, JJ., concur.

DOUGLAS and RESNICK, JJ., concur in part and dissent in part.

---

1. The elimination of the aggravating circumstance of escape from Counts Four and Six raises the question of whether this court should proceed to review the aggravating and mitigating factors related to the remaining death-penalty-eligible Count Five. There appears to exist the possibility that a jury, charged in accordance with our findings in regard to Counts Four and Six, might come to a different conclusion regarding the remaining aggravating circumstances as they apply to the facts of Count Five. The question then becomes whether the appellant is being denied his right to trial by jury since this court is, in effect, conducting a *de novo* review of the remaining aggravating circumstances from Count Five. If we had sustained the death penalty imposed in that count, there would be grounds for raising the propriety of that review. However, since we are vacating the death penalty, while sustaining the element of prior calculation and design—which was not alleged in Counts Four or Six—the issue is moot. We have found sufficient evidence to convict under the allegations of Count Five, but insufficient evidence to warrant the death penalty. Thus, appellant is not being deprived of jury consideration of any issues that might alter the outcome.

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part. I concur with the majority in the affirmance of the convictions, but must respectfully dissent from its reversal of the death penalty.

I cannot come to the conclusion, as did the majority, that both the trial court's and court of appeals' analyses of the mitigating factor of mental disease or defect were flawed.

The court of appeals stated, "all of the medical experts who examined the defendant, including the defense's examiners, agreed that notwithstanding his mental disease or defect, the defendant did not lack the substantial capacity to appreciate the criminality or wrongfulness of his conduct." The court went on to point out that the primary issue contested in the mitigation hearing was "whether the defendant lacked the substantial capacity to conform his conduct to the requirements of the law." Hence both the trial court and court of appeals used the proper standard, that is, "substantial capacity." The lower courts properly accorded this mitigating factor some weight. However, they found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. I agree and would affirm the decision of the court of appeals as to both the convictions and death penalty.

DOUGLAS, J., concurs in the foregoing opinion.